Entered on Docket
June 04, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



**NOT INTENDED FOR PUBLICATION**

The following constitutes
the order of the court. Signed June 01, 2007

_____
Marilyn Morgan
U.S. Bankruptcy Judge
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re KATHY COLTON and SAMER SWEIDEN,<br><br>　　　　Debtors. | Case No. 05-56430-MM<br><br>Chapter 7 |
| SOUTH BAY TELECOM,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>SAMER SWEIDEN,<br><br>　　　　Defendant. | Adversary No. 05-5622<br><br>**MEMORANDUM DECISION FOLLOWING TRIAL** |

### INTRODUCTION

Before the court is the complaint of creditor South Bay Telecom, which alleges that debtor Samer Sweiden owes South Bay over $30,000 for pre-paid telephone calling cards that were allegedly delivered to Sweiden. South Bay seeks a determination that the debt is excepted from discharge under § 523(a)(4). The matter was tried on January 31, 2007 at which time Sweiden appeared and represented himself; South Bay was represented through counsel. Based on the evidence adduced at trial and the arguments of the parties, the court concludes that South Bay cannot satisfy its burden of proof that the debt is not dischargeable, and judgment is awarded in favor of defendant Sweiden.

1

# FACTS

South Bay is a general partnership engaged in the wholesale distribution and sale of pre-paid telephone calling cards. According to the company's general partner, Fadi Fleifel, South Bay uses two independent distribution channels. First, distributors may purchase cards from South Bay and re-sell them. Because the distributors actually purchase the cards, they assume the risk that they will not be able to re-sell them. Second, South Bay hires independent contractors, known as sales agents, who take possession of cards belonging to South Bay and attempt to sell them to retailers on behalf of the company. If cards are not sold, the sales agents can return them to South Bay. No money is exchanged until the sales agent collects from a retail customer.

In June 2004, Sweiden became a South Bay sales agent pursuant to a written Sales Representative Agreement. As a sales agent, Sweiden's duties included selling activated pre-paid telephone calling cards, collecting the money due upon the sale of the cards, returning any unsold cards to South Bay, and otherwise representing the interests of South Bay. The Agreement provided that Sweiden was responsible for paying South Bay for the value of any cards issued to him that were not returned to South Bay.

To keep track of the cards it provides to its sales agents, South Bay issues a billing invoice that lists the number of cards provided to the sales agent along with the face value of each card. On the invoice, South Bay subtracts a percentage "discount" from the face value of the cards. The discounted price is the amount that the sales agent will owe to South Bay if they do not return the cards. The sales agent can then go out and offer the cards to retailers for an amount somewhere between the discounted price and the face value. The agent's commission is any amount over the discounted price for which he sells the cards. The sales agent acknowledges receipt of the listed cards by signing the bottom of the billing invoice. South Bay then enters the information from the billing invoice into South Bay's computer system to create an electronic record of the outstanding cards and the amount that the sales agent owes to the company.

South Bay provides customer lists and other leads to its sales agents. However, the sales agents are also authorized to make cold calls on any retailer in their assigned territory. Whether a lead is provided or not, all customers are customers of South Bay, not of the sales agent. When an agent makes

2

a sale to a retailer, the agent fills out a three-part sales invoice that reflects the number of cards sold to the retailer. The agent gives one copy of the sales invoice to the purchaser of the cards and keeps another for his own records. The agent returns the third copy of the invoice to South Bay, and South Bay uses the sales invoice to enter the sale into its computer system where it stores a running balance of how many cards are out with retailers and whether the sales agent has collected the amount that the retailer owes for the cards. An agent can return unsold cards at any time and close the balance that he owes the company. Thus, in the normal course of business, an agent should either have sales invoices showing sales to retailers or unsold cards, which, together, should equal the amount the agent owes to the company.

Sometime in 2005, Sweiden stopped working for South Bay. Sweiden testified that he left the company in February, but Fleifel believes that Sweiden was still working at South Bay beyond that time. According to Fleifel, South Bay's records indicated that Sweiden owed the company close to $40,000 upon his departure. This debt arose from cards issued to Sweiden but for which Sweiden could not account. Fleifel stated that South Bay tried to help reduce the amount that Sweiden owed the company by assisting in the collection of Sweiden's outstanding sales invoices and by discounting the company's usual profit margin. As proof of the amount currently owed, South Bay offered into evidence certain unsigned, computer-generated versions of billing invoices allegedly documenting cards given to Sweiden, sales invoices documenting sales that Sweiden made to retailers and a computer-generated document entitled Customer Open Account Balance, which reflects that Sweiden owes the company $30,059.75. According to Fleifel, Sweiden has not produced unsold cards or sales invoices that would reconcile the open account balance.

Sweiden offered no documentary evidence of his own. However, he specifically denied taking anything from South Bay. By way of direct and cross-examination, Sweiden testified that he always signed South Bay's billing invoices when he actually received cards. He urged that the billing invoices offered by South Bay are not signed by Sweiden and, therefore, do not prove that Sweiden ever received the cards reflected on those invoices. Sweiden specifically referenced a billing invoice dated April 13, 2005 indicating that South Bay gave Sweiden $4,585 in cards on that date. Sweiden explained that he did not receive the cards reflected on the unsigned invoice because he left the company in February

3

1  2005 and did not receive any cards after that time. Sweiden further testified that when he brought in
2  money or sales invoices to South Bay, he gave them to the company and then had no control over
3  whether the information on those invoices was correctly entered into the company's computer system
4  or whether the money was properly credited against what he owed the company.

5  Sweiden testified that Fleifel confronted Sweiden and claimed that Sweiden owed the company
6  $25,000, but Sweiden told him that he did not owe South Bay anything. Sweiden asked Fleifel to
7  engage in an audit of South Bay's records to reconcile the amount that Sweiden might owe to the
8  company, but Fleifel refused and said that the company did not make mistakes. Sweiden urges that
9  South Bay cannot prove whether he owes the money claimed or whether some other employee stole the
10 money and left the balance owing on Sweiden's account to make it look like Sweiden took the money.
11 Sweiden listed a $25,000 debt to South Bay on his bankruptcy schedules only because that is what South
12 Bay said he owed, not because he actually believed that he owed the company money. He wanted his
13 bankruptcy case to take care of any possible debts.

14 Fleifel testfied that South Bay gave Sweiden all the cards listed in the billing invoices that are
15 in evidence. He no longer has the paper billing invoices with Sweiden's signature because he gave them
16 to Sweiden so that Sweiden could go through them and see that he still owed the company money.
17 Fleifel did not worry about giving Sweiden the originals because South Bay still had its computer
18 records and copies of checks that they always keep. According to Fleifel, after Sweiden reviewed the
19 invoices, Sweiden admitted to Fleifel that his account was short and that he had apparently spent some
20 of the cash that he had collected rather than giving it to South Bay. Sweiden insists that he has no
21 copies of any invoices and did not produce any in discovery.

### DISCUSSION

**I.   As a matter of law, plaintiff cannot establish the existence of an express trust required to except the debt from discharge due to fraud or defalcation by a fiduciary.**

Under § 523(a)(4), a debtor is not discharged from any debt that arises out of the debtor's fraud or defalcation while acting as a fiduciary. 11 U.S.C. § 523(a)(4). However, a fiduciary relationship, in the broad, general sense of a relationship involving confidence, trust and good faith, is not enough

4

for purposes of this exception to discharge. *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986). Before a debt may be found non-dischargeable for fraud or defalcation by a fiduciary, the plaintiff must prove that 1) an express or technical trust giving rise to the fiduciary relationship was in existence prior to the act creating the debt, 2) the debt was caused by fraud or defalcation, and 3) the defendant acted as a fiduciary to the plaintiff at the time the debt was created. *Banks v. Gill Distribution Centers, Inc. (In re Banks)*, 263 F.3d 862, 870 (9th Cir. 2001).

Whether an express or technical trust exists and results in the requisite fiduciary relationship is a question of state law. *Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1125 (9th Cir. 2003); *Ragsdale*, 780 F.2d at 796. Under California law, there are several essential elements to an express trust: 1) sufficient words to evidence the settlor's intent to create a trust, 2) a definite trust purpose, 3) a certain and ascertainable trust res or property, and 4) a clear and definite beneficiary. 13 Witkin, SUMMARY OF CALIFORNIA LAW, Trusts § 26 (10th ed. 2005). *See also Banks*, 263 F.3d at 871. While, in some instances, a state statute or common law doctrine may impose trust-like obligations that are sufficient to satisfy the requirements of an express trust, plaintiff cites to no California law that elevates an agency relationship to the status of a technical trust. To the contrary, this court has previously recognized that an agency relationship, alone, is not enough. *See In re Grabau*, 151 B.R. 235, 240 (Bankr. N.D. Cal. 1991)(a real estate salesman was not the type of fiduciary required by § 523(a)(4)).

South Bay's reliance on the Sales Representative Agreement as evidence of a trust is not persuasive. Nothing in that agreement indicates that the parties intended to establish an express or technical trust. Rather, South Bay, in the more general sense, placed its confidence in Sweiden and expected Sweiden to care for the pre-paid telephone calling cards appropriately. Because the record is devoid of any proof that an express trust existed between Sweiden and South Bay, the claim fails as a matter of law.

**II.   The facts do not establish, by a preponderance of the evidence, the elements necessary to except the debt from discharge based on embezzlement.**

Section 523(a)(4) also provides that debts arising out of a debtor's embezzlement will be excepted from the debtor's discharge. 11 U.S.C. § 523(a)(4). Embezzlement, for purposes of this

5

**MEMORANDUM DECISION FOLLOWING TRIAL**
Case: 05-05622   Doc# 19   Filed: 06/01/07   Entered: 06/04/07 14:07:48   Page 5 of 8

exception from discharge is "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Littleton v. Transamerica Commercial Finance Corp. (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991), *quoting*, *Moore v. United States*, 160 U.S. 268, 269 (1895); 4 COLLIER ON BANKRUPTCY ¶523.10[2] (15th ed. rev. 2006). This portion of § 523(a)(4) does not require the existence of a fiduciary relationship. *First Delaware Life Insurance Co. v. Wada (In re Wada)*, 210 B.R. 572, 576 (9th Cir. B.A.P. 1997). Nevertheless, it has three essential elements: 1) property rightfully in the possession of a non-owner; 2) the non-owner's appropriation of the property to a use other than which it was entrusted; and 3) circumstances indicating fraud. *Littleton*, 942 F.2d at 555; *Wada,* 210 B.R. at 576.

Applying these standards to the evidence offered at trial, the court must conclude that South Bay cannot prove embezzlement by a preponderance of the evidence. The disputed factual issues necessary to resolve the embezzlement claim turn on the credibility of the witnesses. Nothing in the record before the court suggests that one witness' testimony is more reliable than the other's. As a consequence, the result depends on the burden of proof. Although South Bay provided a series of billing invoices that were admitted into evidence as typical billing invoices documenting the issuance of telephone calling cards to sales agents, none of the invoices are signed by Sweiden to acknowledge his receipt of the cards reflected thereon. South Bay's failure to offer the signed paper billing invoices listing the cards it gave to Sweiden is fatal to its ability to prove its claim. Although Fleifel testified that South Bay gave Sweiden the cards listed on the invoices, Sweiden countered that he did not receive them. Sweiden stated that he did not receive any cards after he left the company in February 2005, and each of the invoices in evidence is dated after February 2005. Because the only evidence is Fleifel's word against Sweiden's word, it cannot be said that South Bay has proved the first element of embezzlement by a preponderance of the evidence.

There is another reason why South Bay cannot succeed on its embezzlement claim. Under § 523(a)(4), it is not appropriate to assume that embezzlement has taken place simply because property is missing. 4 COLLIER ON BANKRUPTCY at ¶523.10[2]. Rather, the plaintiff must offer evidence of circumstances indicating fraud. Here, the evidence before the court establishes that South Bay's computer-generated records indicate that $30,059.75 in pre-paid telephone calling cards are unaccounted

6

**MEMORANDUM DECISION FOLLOWING TRIAL**

for. While it is Fleifel's personal belief that Sweiden kept the cards or sold the cards and kept the money, Sweiden testified that he did not take any of South Bay's money or property. Sweiden also offered a second, equally plausible, explanation for the discrepancy in South Bay's books, namely, that another employee took the money but fixed the books to make it look like Sweiden still had an outstanding balance. Again, South Bay simply has not established by a preponderance of the evidence that Sweiden intended to defraud South Bay by appropriating the cards to his own use.

## CONCLUSION

In sum, this matter involved difficult issues of proof regarding the existence of an express trust and whether Sweiden actually received all the calling cards that South Bay claims he received. For the reasons explained, the court concludes that plaintiff, South Bay Telecom, cannot satisfy its burden of proving that the debt at issue should be excepted from discharge under § 523(a)(4). As a result, judgment is awarded in favor of defendant Samer Sweiden and against plaintiff South Bay Telecom. The parties are directed to confer and submit a proposed judgment that is consistent with this decision.

Good cause appearing, IT IS SO ORDERED.

**** END OF ORDER ****

7

**MEMORANDUM DECISION FOLLOWING TRIAL**

Adv. P. 05-5622

**UNITED STATES BANKRUPTCY COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

<u>**SERVICE LIST**</u>

Robert N. Weaver
LAW OFFICES OF LESS & WEAVER
1388 Sutter Street, Suite 800
San Francisco, CA 94109-5453

Samer Sweiden
2338 Karen Dr., Unit #5
Santa Clara, CA 95050

8
**MEMORANDUM DECISION FOLLOWING TRIAL**
Case: 05-05622   Doc# 19   Filed: 06/01/07   Entered: 06/04/07 14:07:48   Page 8 of 8